```
                  IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF PENNSYLVANIA


WILLIAM BREEDLOVE,              :    CIVIL ACTION
                                :    NO. 09-cv-75120
         Plaintiff,             :
                                :
    v.                          :
                                :
CSX TRANSP. CORP.,              :
                                :
         Defendant.             :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                              AUGUST 17, 2009

        Plaintiff William Breedlove ("Breedlove") brought this lawsuit against Defendant CSX Transportation, Inc. ("CSX"), after he was diagnosed with mesothelioma in February 2008. Breedlove's complaint comprised a single tort claim, sounding in premises liability,[1] in which Breedlove alleged that he had been exposed to asbestos while on CSX property; that this exposure was an actual and proximate cause of his mesothelioma; and that he had been an invitee of CSX, to whom CSX breached its duty of ordinary care.

---

[1] Breedlove's complaint, which incorporates elements of the master long-form complaint from the Asbestos Multi-District Litigation, No. 875, references mostly products liability causes of action. In its Motion for Summary Judgment, CSX argues that, notwithstanding Breedlove's pleadings, the legal theory upon which he brings the present action lies in premises liability. Breedlove, in his Reply to Defendant's Motion for Summary Judgment, relates that "the parties agree that Georgia law, including its premises law, controls the determination of these issues." (Pl.'s Resp. to Def. Mot. Sum. J., doc. no. 27, at 2.) Therefore, this memorandum addresses Breedlove's claims as though pleaded under premises liability law.

CSX now moves for summary judgment, arguing that Breedlove was a licensee to whom it owed only a duty to refrain from willful or wanton conduct; that as a matter of law, it did not violate any duty if in fact Breedlove was exposed to asbestos on CSX property; and that, in any event, Breedlove failed to produce evidence sufficient to survive summary judgment on the question of whether he was exposed to asbestos while on CSX's property.

This Court will deny CSX's motion for summary judgment because, for the reasons set forth below, it finds that CSX has failed to show that Breedlove was a licensee as a matter of law, and that questions remain for the jury as to whether Breedlove was exposed to asbestos during his visits to CSX property and, if he was, whether CSX breached its duty of ordinary care.

I.   BACKGROUND

William Breedlove ("Breedlove") worked as an insurance agent from 1957 until 1995. In 1962, when he joined Provident Insurance ("Provident"),[2] Breedlove began selling insurance to railroad employees, including employees of defendant CSX Transportation ("CSX").[3] The policies that Breedlove sold – mostly disability, life and dependant insurance – were

---

[2]   Breedlove remained employed by Provident through 1995.

[3]   In 1962, Breedlove began soliciting sales to railroads that were predecessors of CSX.  Because CSX acquired these railroads during or after the sixties, this memo refers to all predecessor railroads that CSX serviced collectively as "CSX."

supplemental to the basic insurance coverage that CSX was contractually obliged to provide to its employees. CSX allowed its employees to pay for the coverage that they purchased through payroll deductions. Breedlove received commissions, from Provident, on the sales that he made.[4]

Breedlove solicited sales from CSX employees primarily at two of CSX's mechanical shops. Beginning in the 1960s, Breedlove traveled to a shop in Atlanta, Georgia ("Tilford"), which he visited two or three days per month. Starting in the 1980s, Breedlove also solicited business from a shop located in Waycross, Georgia ("Waycross"), which he visited two or three times per year. At both shops, Breedlove witnessed employees working on locomotives and other railroad equipment, though he never himself performed any type of mechanical work. Breedlove believes that he saw workers using asbestos-containing insulation, brake shoes, gloves, and rope.[5] (Breedlove Dep. 41:11-44:21, July 11, 2008). At both Tilford and Waycross, Breedlove noticed accumulations of dust in the air, though he

---

[4] Breedlove did not have a written contract with CSX to sell supplemental insurance to its employees, and at no time was he an employee of CSX.

[5] Breedlove initially testified that he observed employees working with these items "years and years ago" (Breedlove Dep. 42:25, July 11, 2008), and later noted that the time period at issue was "probably [during the] '70s, '60s, 70's, '80s, I really don't know." (Id. at 44.24-25).

testified that Waycross was dustier than Tilford.[6]  Id. at 34:23-24.  Because Breedlove preferred not to stray from the employees' work area when he sold insurance, he generally conducted business "on top of a drum or . . . somewhere around the equipment."[7]  Id. at 38:1-14.

To enter and conduct business in the Waycross and Tilford shops, Breedlove sought out and secured permission from CSX's managers.[8]  Breedlove regularly would "chat" with the managerial staff, as he believed that a good relationship with management was necessary for his continued ability to sell

---

[6]  By contrast, when he solicited business from employees at non-CSX railroads, Breedlove indicated that he was not allowed to go inside any maintenance shops.  (Breedlove Dep. 48:9-12, July 11, 2008).  The employees with whom he was allowed to visit "work[ed] on moving the train from place to place and running the business [rather] than actually doing the [maintenance] work." Id. at 25:6-16.  Breedlove testified that the locations he visited at the non-CSX railroads also were dusty.  See Id. at 35:9-15 ("Well, everywhere you went on the railroad it was dusty . . . [i]f you stand 20 feet from a train that is coming by, you are going to breathe in a lot of dust").

[7]  Breedlove wasn't always able to meet employees directly around their workspace in the shops at Tilford and Waycross, however.  A supervisor sometimes "would set aside an extra office . . . and he would send the employees in one at a time to talk to me." (Breedlove Dep. 35:18-21, July 11, 2008).  When pressed by counsel for CSX to quantify the amount of time he spent meeting with CSX personnel in an office as compared to the time he spent in a shop, Breedlove testified that he spent "much, much less time in an office," and that he "was in the shop three-quarters of the time at least." Id. at 36:2, 37:23-24. CSX does not dispute this testimony.

[8]  See Breedlove Dep. 31:3-8 ("Q: How would you get permission to go to the property?  A: Well, that was my job.  My job was to cultivate the management of these companies and to get them on my side so to speak and then be directed by them how they wanted me to work this particular group of employees").

insurance to CSX employees.  (Breedlove Dep. 37:6-11, July 11, 2008).  The managers initially provided escorts for Breedlove, though, and as he became more familiar with Tilford and Waycross, they allowed him to solicit sales without an escort.  Perhaps because Breedlove's visits became so regular, CSX issued him safety equipment, including a hard hat (but not a respirator or mask). (Breedlove Dep. 39:1-6, July 11, 2008).

Breedlove was diagnosed with mesothelioma in February, 2008, and he died six months later, in August.  Breedlove's wife, Eva, maintains the present action as the executrix of his estate.

II.  LEGAL STANDARD - MOTION FOR SUMMARY JUDGMENT

A court may grant summary judgment when "the pleadings, the discovery and the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[9]  Fed. R. Civ. P. 56(c).  A fact is "material" if its existence or non-existence would affect the outcome of the suit under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" when there is "sufficient evidence from which a reasonable jury could find in favor of the non-moving party." El v. Se. Pa. Transp. Auth., 479

---

[9]  The procedural standards pertaining to summary judgment are controlled by federal law.  Therefore, this memorandum applies the procedural law of the Third Circuit relative to motions for summary judgment.

F. 3d 232, 238 (3d Cir. 2007).  All reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant.  <u>Disabled in Action of Pa. v. Se. Pa. Transp. Auth.</u>, 539 F. 3d 199, 201 (3d Cir. 2008).  The Court is not permitted to make inferences based on speculation.  <u>Lexington Ins. Co. v. Western Pa. Hosp.</u>, 423 F. 3d 318, 333 (3d Cir. 2005).  So long as at least one reasonable inference may be drawn in favor of the non moving party, summary judgment is inappropriate, and the fact finder will have to determine which inference is correct.  <u>Ideal Dairy Farms v. John Labatt</u>, 90 F. 3d 737, 744 (3d Cir. 1996) (citing <u>Nathanson v. Medical College of Pa.</u>, 926 F. 2d 1368, 1380 (3d Cir. 1991)).

Further, while the moving party bears the initial burden of showing the absence of a genuine issue of material fact, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather its response must – by affidavits or as otherwise provided in [Rule 56] – set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  Summary judgment is also proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp. V. Catrett</u>, 477 U.S. 317, 322 (1986).

III. DISCUSSION

    A.   <u>Breedlove's status as an invitee or licensee under Georgia law</u>

CSX argues that Breedlove was a licensee because CSX "did not invite, induce, or lead him to CSX's premises." (Def.'s Mot. for Summ. J., doc. no 21, at 11). CSX contends that, since Mr. Breedlove was a licensee, CSX would be liable only for willful or wanton injuries. <u>Id.</u> at 13. Therefore, even if Mr. Breedlove was exposed to asbestos on CSX property, CSX claims that their conduct did not rise to the level of willful and wanton misconduct and thus, it is entitled to summary judgment. <u>Id.</u> at 17-18.

The parties agree that Georgia substantive law applies. The Georgia legislature has codified the common law definitions relative to invitees and licensees. Specifically, O.C.G.A. Section 51-3-1 defines, and sets forth the duties owed to, an invitee:[10]

> Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe.[11]

---

[10] The legislature drafted the statutory language contained at Section 51-3-1, pertaining to invitees, with reference to <u>Atlanta Cotton-Seed Oil Mills v. Coffey</u>, 4 S.E. 759 (Ga. 1887).

[11] However, the landowner is not his invitee's insurer. <u>See</u>, e.g., <u>Winn-Dixie Stores, Inc. v. Hardy</u> 226 S.E.2d 142 (Ga. Ct. App. 1976); <u>Colbert v. Piggly Wiggly S.</u>, 332 S.E.2d 304 (Ga. Ct. App. 1985); <u>N.L. Indus. v. Madison</u> 336 S.E.2d 574 (Ga. Ct. App. 1985). The landowner must keep the premises safe from, or take

7

With regard to licensees, Section 51-3-2(a) defines a licensee as "a person who (1) is neither a customer, a servant, nor a trespasser; (2) does not stand in any contractual relation with the owner of the premises; and (3) is permitted, expressly or impliedly, to go on the premises merely for his own interests, convenience or gratification." O.C.G.A. Section 51-3-2(a). With respect to a licensee, the landowner or occupier is liable only for its willful or wanton conduct. O.C.G.A. 51-3-2(b). See also Ballenger Paving Co. v. Gaines, 499 S.E. 2d 722, 728 (Ga. Ct. App. 1998) (citing Lee v. Myers, 374 S.E. 2d 797 (Ga. Ct. App. 1988)). If the owner has actual or constructive knowledge that a

---

steps to discover (and make his guest aware of), dangers and defects that are not obvious to, and capable of being avoided by, the invitee through the use of ordinary care. N.L. Indus., 366 S.E. 2d at 577. But the landowner is under no duty to discover or correct defects or dangers that are not capable of being discovered. McCurly v. Ludwig, 452 S.E. 2d 554, 555 (Ga. Ct. App. 1994).
    The American Law Institute provided instructive guidance on the duty owed to invitees when it promulgated Section 51 of the Restatement Third of Torts Tentative Draft No. 6 in Spring 2009. Section 51 contemplates that a landowner must exercise reasonable care to take precautions with respect to risks that he creates on the premises, as well with respect to natural conditions that are a part of the premises. Rest. (Third) of Torts, § 51 cmt. a,b,e 2009 . Comment H details two specific types of precautions: durable and transient. The latter includes oral warnings, while the former comprises precautions that "remain in place and thus eliminate or reduce risk over a lengthier period of time." Rest. (Third) of Torts, § 51 cmt. h (2009 . Further, because "[t]ransient precautions can only be provided and effective when the presence of the entrant is known or foreseeable . . . they are not required when the circumstances do not suggest a foreseeable risk. . . . Durable precautions are generally more burdensome and are not required unless the risk of harm exceeds the burden of taking the durable precaution." Id.

licensee is "within the range of a dangerous act being done or a hidden peril . . . ," it is willful or wanton not to exercise ordinary care to warn the licensee. Aldridge v. Tillman, 516 S.E. 2d 303, 307 (Ga. Ct. App. 1999) (citing Wade v. Mitchell, 424 S.E. 2d 810, 813 (Ga. Ct. App. 1992)).

The determination of a visitor's status has posed a "perennial" challenge[12] for Georgia courts, which apply a "mutuality of interest" test to distinguish between invitees and licensees.[13] Chatham v. Larkins, 216 S.E. 2d. 677, 678 (Ga. Ct. App. 1975). A person is deemed an invitee if he has been induced, expressly or impliedly, to come upon the premises for any lawful purpose and his presence on the premises "is of mutual

---

[12] Elsewhere, courts have observed that the traditional status based duties have become a "semantic morass." Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625 (1959) (citing Kermarec v. Compagnie Generale Transatlantique, 245 F. 2d 175, 180). Perhaps because of the difficulties related to the application of the status based tests, twenty four other jurisdictions have moved toward the imposition of a unitary duty of care at least with respect to licensees and invitees. Rest. (Third) of Torts, § 51 cmt. a  2009 .

[13] Breedlove alternatively argues in favor of an "invitation" test as a means to distinguish between invitees and licensees. Pl. Resp. Def. Mot. Sum. J., 15, Doc. No. 27. That test turns not on whether the visitor's presence confers a benefit on the landowner, but on whether the landowner makes an implied representation when "he encourages others to enter to further a purpose of his own, that reasonable care has been exercised to make the place safe for those who come for that purpose . . . ; but, as in the case of the social guest, invitation is not enough without the circumstances which convey the implied assurance." Prosser, Torts 2d., p. 456, §78. Whether or not Georgia should adopt the "invitation" test, the Court leaves, as it must, to the wisdom of the Georgia courts.

benefit to both him and the landowner." Matlack v. Cobb Elec. M'ship Corp., 658 S.E. 2d 137, 139 (Ga. Ct. App. 2008).

Two cases illustrate the application of the mutuality of interest test. In Findley v. Lipsitz, 126 S.E. 2d 299, 301 (Ga. Ct. App. 1962), an electrical appliance salesman who entered defendant's store to sell light bulbs had a mutual interest with the owner when he replaced defendant's burnt out bulbs, using defendant's stock, in the hope of encouraging defendant to buy new bulbs. The Court found a mutuality of interest because defendant "benefitted by having his store better lighted," and plaintiff "derived a potential benefit by making his product and services known to the defendant, a prospective customer."[14] Id. On the other hand, in Todd v. Byrd, 640 S.E. 2d 652, 657 (Ga. Ct. App. 2006), the court held that an individual who entered a store to use the restroom, and not to shop, was a

---

[14] Similarly, a group of children and their parents were held to be invitees when, at defendant's invitation, they cleared the fish left behind after defendant drained its reservoir, because defendant had an interest in keeping the reservoir free of fish, plaintiffs had an interest in clearing the fish "for the sport enjoyed," and all parties had an interest in maintaining the reservoir in a sanitary condition. Flint River Cotton Mills v. Colley, 30 S.E. 2d 426, 427 (Ga. Ct. App. 1944). See also T & M Investments v. Jackson, 425 S.E. 2d 300, 303 (Ga. Ct. App. 1992) (finding that Plaintiff mall security guard was an invitee of Defendant mall shop proprietor because Defendant befitted from security services provided by Plaintiff); Sacker v. Perry Realty Services, 457 S.E. 2d 208, 210 (Ga. Ct. App. 1995) (holding that Plaintiff condominium owner was an invitee of Defendant condominium association and management company with respect to the condominium's common areas because Declaration of Condominium established mutuality of interest).

licensee because he had no present business relations with the owner.

Here, the undisputed facts show that, beginning in 1962, Breedlove regularly went to the Tilford maintenance shop in order to sell supplemental insurance to CSX's employees, and that he did the same at the Waycross shop beginning in the 1980s. CSX allowed its employees to pay for the insurance that they purchased through payroll deductions. While it is true that Breedlove was never under contract with CSX, nor was he CSX's employee, CSX managers, in response to Breedlove's entreaties, gave Breedlove repeated permission to come onto CSX property to service CSX's employees insurance needs. Under these circumstances, this case is close to Findley, in that CSX benefitted from having Plaintiff service CSX's employees.[15]

---

[15] Courts from a number of other jurisdictions have found a mutuality of interest on facts similar to those of this case. See, e.g., Purtell v. Philadelphia & Reading Coal & Iron Co., 99 N.E. 899 (Ill. 1912); Bustillos v. Southwestern Portland Cement Co., 211 S.W. 929 (Tex. Com. App. 1919); McCowat Mercer Printing Co. v. Taylor, 115 F. 2d 868 (6th Cir. 1940). All three cases held that restaurant delivery boys were invitees of a defendant landowner because the landowner had an interest in ensuring that employees were able to eat or hydrate without having to interrupt their work routine. In another context, Harmon v. Speer, 144 N.E. 241, 243 245 (Ind. 1924), held that an insurance salesman was the defendant railroad company's invitee because of defendant's written statement that plaintiff was "under regular contract with this company". The court ruled that this evidenced a mutual interest, "pecuniary or otherwise," in plaintiff's solicitation of insurance to defendant's employees. Id. at 243.

CSX points to two early twentieth century Kentucky cases, <u>Indian Refining Co. v. Mobley</u>, 121 S.W. 657, 658 (Ky. 1909) and <u>Cummings' Adm'x v. Paducah Grain & Elevator Co.</u>, 226 S.W. 345, 346 (Ky. 1920), in which the court found that the defendant did not benefit from the plaintiff agent's sale of insurance to the defendant's employees, making the agent at most a licensee.  These cases are distinguishable because in those cases the courts did not apply the more modern mutuality of interest test.

The two other two cases cited by CSX, <u>Edmunds v. Copeland</u> and <u>Offut et al. v. O'Leary</u>, are also distinguishable. In <u>Edmunds</u>, the court found that an insurance saleswoman was a licensee, despite the fact that defendant had filled out and returned a card signifying interest in purchasing a policy from plaintiff, when the plaintiff called on defendant at the time of her choosing, without first having made an appointment, and when plaintiff was injured before she had consummated a business relationship by negotiating for the sale of the policy.  398 S.E. 2d. 280, 281 (Ga. Ct. App. 1990).  In <u>Offut</u>, the court held that an insurance agent in the process of calling on a customer at the defendant landlord's house became a mere licensee when he deviated from the normal path set aside for sales calls.  265 S.W. 296, 297 (Ky. 1924).

Here, the undisputed record shows that Breedlove

visited CSX's factories only after receiving permission from its managerial staff, at their direction, and over a long period of time. In addition, as previously discussed, there is no evidence from which a jury could reasonably conclude that Breedlove strayed from those portions of the premises in which CSX permitted him to conduct business.  Under these circumstances CSX has not shown that Breedlove was a licensee as a matter of law.

        B.   <u>Proximate Cause</u>

            i.  Evidence of Exposure to Asbestos on CSX Property

CSX additionally argues that it is entitled to summary judgment because Breedlove has not pointed to evidence on this record from which a fact finder reasonably could conclude that he was exposed to asbestos while on CSX property.  (Def. Repl. to Pl. Resp. to Def. Mot. Sum. J., doc. no. 28, at 14).  Causation is an essential element of Breedlove's premises liability claim.

The record evidence shows that Breedlove regularly noticed accumulations of "dust" in the atmosphere at both the Tilford and Waycross stations.  According to his deposition testimony, Breedlove believed that this dust was present as a result of the work that CSX employees conducted on locomotives and other railroad equipment, and that it contained asbestos fibers.[16]  (Breedlove Dep. 29:3-6, July 11, 2008).

---

[16] However, Breedlove also admitted that he could not be sure exactly what the dust contained.  (Breedlove Dep. 41:7 10, July

At his deposition, Breedlove used photographs to identify several asbestos containing products, including train brake pads, workers' gloves, rope, and insulation, as having been used by CSX employees. (Breedlove Dep. 41 44, July 11, 2008). Breedlove also testified that a CSX employee gave him a piece of asbestos rope, and that he recalled CSX employees discussing the subject of asbestos particularly with respect to insulation and gloves. Id.

To corroborate his deposition testimony, Breedlove points to a learned treatise, which detailed that railroads used asbestos products in their maintenance shops up until the mid to late twentieth century. (Pl. Resp. Def. Mot. Sum. J., doc. no. 27, at Ex. G ). He also attached correspondence from a CSX doctor, which included a list of asbestos products commonly used by railroads indicating that CSX, in particular, used a number of the listed products at least through the 1960s or 1970s. (Pl. Resp. Def. Mot. Sum. J., doc. no. 27, at Ex. H). Additionally, CSX's designated corporate representative, Mark Badders ("Badders"), testified in a separate case that CSX used a number of possibly asbestos containing products, including gaskets and packing materials. (Badders Dep. 91 92, Sept. 16, 2008, Grimes v. CSX Transp., Inc., civ. no. 16-2007-CA-003677 (Fl. Cir. Ct.));

---

11, 2008).

See also (Pl. Resp. Def. Mot. Sum. J., Ex. H, Doc. No. 27). Badders acknowledged that certain groups of employees were issued masks to guard against asbestos exposure during the normal course of their work.[17] (Badders Dep. 105:1 10, Sept. 16, 2008). Finally, Breedlove submits an expert medical opinion that his mesothelioma was caused by his exposure to asbestos while on CSX property. (Pl. Resp. Def. Mot. Sum. J., doc. no. 27 at Ex. I).

Breedlove has pointed to evidence sufficient to create a genuine issue of material fact as to whether he was exposed to asbestos that was released by products used by CSX at Tilford and Waycross and whether that exposure caused the onset of his mesothelioma. The Court finds that a fact finder reasonably could infer, without resorting to speculation or conjecture, that Breedlove inhaled asbestos fibers that were released into the air by CSX employees at the Tilford and Waycross shops.

ii. Application of Blackston standard to premises liability.

Finally, CSX argues that Breedlove's evidentiary proffer with regard to causation is insufficient in light of Blackston v. Shook and Fletcher Insulation Co., 764 F.2d 1480,

---

[17] Badders also testified that asbestos fibers can be released in dust form if the asbestos containing product is not dampened with water before it is manipulated, for instance with a saw or grinder. (Badders Dep. 104:4, Sept. 16, 2008). Neither party points to evidence indicating whether CSX employees commonly took steps to abate the formation of dust in its maintenance shops, or indeed whether such dust abatement procedures were feasible.

1486 (11th Cir. 1985).  In <u>Blackston</u>, the Eleventh Circuit, interpreting Georgia law, articulated the summary judgment standard by which federal courts are to assess the sufficiency of a plaintiff's proffer of asbestos exposure in a products liability suit.  A plaintiff in an asbestos products liability suit must be able to identify other individuals with whom they worked and provide affidavits from those coworkers stating which asbestos containing products they worked with, or have coworkers testify both that they worked with the plaintiff and that specific asbestos containing products were used at that worksite. <u>Blackston</u> 764 F.2d at 1482  (internal citations omitted).

<u>Blackston</u> is distinguishable from the instant case because <u>Blackston</u> articulated the heightened standard in a products liability case, not a premises liability case.  The <u>Blackston</u> court reasoned that a more rigorous standard of proof was necessary in products liability cases in order to forestall the imposition of a de facto market share or industry wide liability scheme with respect to defendants named in products liability actions.  Thus, requiring plaintiffs to identify those products to which they were exposed ensured that each defendant would have "liability for injuries adjudged on the basis of his own marketed product and not that of someone else." 764 F.2d at 1483.  That consideration is not present in a premises liability action, where a plaintiff is asserting asbestos exposure at a

16

specific worksite, and defendant's liability is determined with respect to the specific conditions present on that worksite. There is not the same danger of plaintiffs imposing a market-share or industry-wide liability scheme.  Therefore, this Court declines to extend the <u>Blackston</u> standard beyond the products liability context in which it was decided.

IV.   CONCLUSION

For these reasons, CSX's motion for summary judgment shall be denied.  An appropriate order follows.